UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X   Case No.:   1:25-cv-1265
RUTH CALLE,

                              Plaintiff,                                **AMENDED COMPLAINT**

   -against-

CANNON KEARNEY,                                        Plaintiff Demands
                                                                            a Trial By Jury
                                 Defendant.
---------------------------------------------------------------X

Plaintiff, by and through her attorneys, PHILLIPS & ASSOCIATES, PLLC, hereby complains of Defendant CANNON KEARNEY (hereinafter "KEARNEY"), upon information and belief, as follows:

**NATURE OF THE CASE**

1. Plaintiff complains pursuant to the NYC Gender Motivated Violence Act, N.Y.C. Admin Code §§ 8-901 *et. seq*, seeking damages to redress the injuries she has suffered as a result of being sexually assaulted, battered, and physically abused by Defendant KEARNEY.

2. Defendant KEARNEY is a licensed attorney practicing law in the State of New York, and Managing Partner of the Espinosa Kearney Law Group.  Defendant KEARNEY has a resume with robust experience surrounding social justice issues, and has spoken out on many legal issues, including those involving female sexual assault survivors.[1] He has also championed his client-centric reputation as he, "Treat[s] every client the way he would want his relatives to be treated."[2]

---

[1] Ironically, on September 21, 2021, Defendant KEARNEY appeared on Court TV to discuss the legal implications stemming from the murder of a young woman, Gabby Petito, by her boyfriend, positing the case as an example of domestic violence going "too far".
[2] https://eklawgroup.com/our-team/cannon-kearney/.

3. However, this is just a facade. Despite his public concern for survivors of domestic violence, Defendant KEARNEY has *himself* perpetrated countless instances of domestic violence, particularly with respect to Plaintiff, to whom he subjected to a brutal pattern of physical and emotional abuse throughout their seven-year relationship.

## JURISDICTION AND VENUE

4. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship, and the matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.00.

5. Venue is proper in this district based upon the fact that a substantial part of the events or omissions giving rise to the claims occurred within the Southern District of New York. 28 U.S.C. § 1391(b).

## PARTIES

6. Plaintiff is a female resident and citizen of the State of Pennsylvania, County of Chester.

7. At all times material, Defendant KEARNEY is a male resident and citizen of the County of New York, State of New York.

## MATERIAL FACTS

8. In or around July 2012, Plaintiff enrolled at the Charlotte School of Law in Charlotte, North Carolina. On her first day of class, Plaintiff met Defendant KEARNEY, a fellow law student who was in Plaintiff's graduating class.

9. During the first few months of school, Defendant KEARNEY courted Plaintiff to be in a romantic relationship.

10. During that time, Plaintiff learned that Defendant KEARNEY was a former officer in the U.S. Army who served in Iraq, that he suffered from Post Traumatic Stress Disorder ("PTSD") as

a result of his military service, and although he was prescribed medication to treat this disorder, he did not take the medication.

11. On or about September 12, 2012, Plaintiff and Defendant KEARNEY began dating.

12. Shortly after, Defendant KEARNEY began a violent, and emotionally abusive, campaign of domestic violence against Plaintiff.

13. For example, Defendant KEARNEY regularly degraded Plaintiff by telling her that she was "fat," and/or "dumb," and routinely mocked Plaintiff for having been sexually abused by a family member when she was a child.

14. In or around December 2012, Plaintiff and Defendant KEARNEY got into an argument while they were driving in Defendant KEARNEY's car. **As Plaintiff attempted to turn off the radio, Defendant KEARNEY forcefully bit her finger**. Nevertheless, later that night, Defendant KEARNEY apologized to Plaintiff and told her, "**I did not mean to hurt you**."

15. As a further example of Defendant KEARNEY's deranged behavior, in or around 2013, **Defendant KEARNEY was so fed up with his neighbor's dog barking, that he filled a hot dog with his medication, and threw it into his neighbor's yard hoping to kill the dog**.

16. Throughout the course of their relationship, Defendant KEARNEY also repeatedly cheated on Plaintiff with other women, which was the basis of many fights that culminated in Plaintiff sustaining physical injuries. Defendant KEARNEY never apologized, but instead, if Plaintiff asked about other women, Defendant KEAREY doubled down and manipulatively accused Plaintiff of being the cheater. Within the course of these arguments, Defendant KEARNEY brutally beat Plaintiff.

17. For instance, on or about January 13, 2013, Plaintiff saw Defendant KEARNEY text messaging another female law student from his computer. Defendant KEARNEY yelled at

3

Plaintiff, "**Why are you looking at my fucking computer!?**" During the course of the argument, **Defendant KEARNEY jumped on top of Plaintiff, with his arms wrapped around her shoulders, which caused Plaintiff's legs to buckle because she could not support his weight.**[3] **Plaintiff fell on the ground with Defendant KEARNEY on top of her, and twisted her left ankle.** *See* Exhibit A.

18. The next morning, Defendant KEARNEY brought Plaintiff to the Novant Health Presbyterian Medical Center, where she was diagnosed with a broken left ankle.

19. In or around May 2013, Plaintiff and Defendant KEARNEY were driving to Myrtle Beach, South Carolina.

20. During the road trip, Defendant KEARNEY pulled over on the side of the road and demanded that Plaintiff get out of the car to have sex in broad daylight. When they got out of the car, Defendant KEARNEY took off his pants and exposed his erect penis in public. Plaintiff immediately got back in the car and refused to have sex with Defendant KEARNEY.

21. In or around April 2013, as Plaintiff stepped one foot on the running board leading up to the passenger seat of Defendant KEARNEY's Cadillac Escalade, **he purposely reversed the car, which caused Plaintiff to fall on the ground and cracked her head open on the concrete driveway**. *See* Exhibit B.

22. Defendant KEARNEY immediately brought Plaintiff to Carolinas Medical Center, where she was diagnosed with a concussion and received several staples in her head.

23. In or around June 2013, while Defendant KEARNEY and Plaintiff were visiting Los Angeles, California, he forcibly pulled her out of the car while they were at a car wash. Plaintiff fell on the ground, hit her head on the pavement, and cracked her head open for a second time.

---

[3] At the time, Plaintiff weighed approximately 165 pounds, and Defendant KEARNEY weighed approximately 225 pounds.

24. Bystanders who witnessed the accident called 911, and an ambulance came to the car wash to take Plaintiff to the hospital. However, Plaintiff declined to go and was treated by the EMTs in the back of the ambulance.

25. During that same trip, Defendant KEARNEY also beat Plaintiff up at in the apartment he was renting for the summer. *See* Exhibit C.

26. On or about July 25, 2013, Plaintiff's law school professor, Dagmar Rita Myslinska, with whom Plaintiff had previously discussed Defendant KEARNEY's domestic violence, gave Plaintiff a reference letter. In the reference letter, Ms. Myslinska alluded to the fact that Plaintiff was a survivor of domestic violence, "…**[Because of] an unfortunate personal relationship [Plaintiff] got involved in in the middle of the Fall semester, her grades began to slip**…"

27. In or around August 2013, having endured Defendant KEARNEY's pervasive physical and emotional torture, Plaintiff was forced to discontinue law school because she was unable to keep up with the work and maintain her grades. Nevertheless, Defendant KEARNEY continued to subject Plaintiff to brutal abuse.

28. On or about August 21, 2013, Plaintiff and Defendant KEARNEY got into an argument over Plaintiff dropping out of law school. **Accordingly, while they were in Defendant KEARNEY's apartment, he repeatedly punched Plaintiff in the face, causing her to sustain a black eye and bloody lip. During the confrontation, Defendant KEARNEY also bit Plaintiff's back**.

29. Shortly after, Plaintiff exited the apartment towards Defendant KEARNEY's car. Defendant KEARNEY followed Plaintiff and the two began arguing outside. A bystander saw the argument and called the police.

30. However, when the police arrived to the scene, Plaintiff and Defendant KEARNEY were *both* arrested.

31. Nevertheless, once Plaintiff was detained, the nurse at the detention facility saw the bite marks on Plaintiff's back and concluded that Defendant KEARNEY had battered Plaintiff, and Plaintiff was released from custody.

32. Subsequently, in or around the first week of October 2013, Defendant KEARNEY told Plaintiff that she was a failure and asked her to put his law school loans in her name so that she would remain trapped in the relationship. When Plaintiff declined, Defendant KEARNEY became so enraged, that he bit Plaintiff's ring finger to the bone, bit her nose, pulled her hair, and slapped her. *See* Exhibit D.

33. Immediately after, Plaintiff went to the Carolinas Medical Center, where she was told that she needed to schedule a surgery to repair her ring finger.

34. Finally, Plaintiff called Defendant KEARNEY to pick her up from the hospital because she did not have anyone else on which to rely for a ride. While Plaintiff was getting into the car, Defendant KEARNEY slammed the car door on the same ring finger that he bit because he was angry at Plaintiff for ruining his day. Plaintiff immediately called 911, and Defendant KEARNEY was arrested and charged with aggravated assault.

35. A few days later, Plaintiff filed a civil restraining order against Defendant KEARNEY.

36. Following these episodes of horrific physical abuse, Defendant KEARNEY would immediately plead for Plaintiff's forgiveness, a typical pattern of behavior by serial abusers.

37. For example, in or around December 2013, Defendant KEARNEY violated the restraining order and contacted Plaintiff via Yahoo messenger. Defendant KEARNEY apologized to Plaintiff and invited her to dinner and suggested that they go to a hotel and church to make

amends and rekindle their relationship. Defendant KEARNEY also told Plaintiff that he would pay her medical bills.

38. A few days later, Plaintiff accepted Defendant KEARNEY's apology, and they continued to date.

39. In or around August 2014, Plaintiff moved to Teaneck, New Jersey, and Defendant KEARNEY moved to Washington Heights, New York, so that he could be close to Plaintiff. While in New York, Defendant KEARNEY attended New York Law School to finish his law degree.

40. Between 2015 through 2019, Defendant KEARNEY forced Plaintiff to give him oral sex on multiple occasions while they were driving in his car in New York City.

41. In or around February 2015, Plaintiff attended Defendant KEARNEY's Superbowl party, which he hosted at his apartment. That night, they got into a fight and Defendant KEAREY punched Plaintiff and pulled her hair. Defendant KEARNEY also dragged Plaintiff into a hallway in his apartment by her shirt.

42. As a result, Defendant KEARNEY's roommate, (name currently unknown), called the police.

43. As another example of Defendant KEARNEY's mentally abusive behavior, on or about June 1, 2015, Defendant KEARNEY sent a text message to Plaintiff, joking about the fact that she was sexually assaulted when she was a child, "**[H]orrible you admit to a stretched out pussy…sad [you] were raped so young [shaking my head]**."

44. A few days later, on or about June 13, 2015, Defendant KEARNEY sent a text message to Plaintiff, "**I mean lose weight, damn/ Like it[']s embarrassing to go out with [you]…Hispanic women in NY, rich or poor, are usually slim build…so why would I be seen with Dumbo the Evil Elephant**."

7

45. In or around the end of July 2015, Plaintiff drove Defendant KEARNEY to Buffalo, New York, so that he could take the New York State Bar Exam.

46. After the exam, when Plaintiff and Defendant KEARNEY went back to their hotel, which was a Motel 6, Defendant KEARNEY beat up Plaintiff.

47. In or around January 2016, Defendant KEARNEY was at Plaintiff's apartment in Hackensack, New Jersey, and they got into a fight because Plaintiff saw Defendant KEARNEY send a text message to another woman with whom he was cheating. Defendant KEARNEY beat up Plaintiff, reopening her head wound as he pushed Plaintiff against the corner of her bedroom dresser. *See* Exhibit E. As a result, Plaintiff stopped speaking to Defendant KEARNEY.

48. On or about February 6, 2016, Defendant KEARNEY tried to contact Plaintiff, and she replied, **"[You] and all know I haven't been [fucking] with [you] since you [b]ashed my head**."

49. Then, on or about February 15, 2016, Plaintiff replied to another text message from Defendant KEARNEY, "**Too bad [you] gashed my head open again though… Life's too beautiful to get near killed**." Defendant KEARNEY did not respond to Plaintiff's text message.

50. Immediately after, Plaintiff broke up with Defendant KEARNEY, changed her phone number, and moved to Maryland.

51. Although Plaintiff was attempting to move on from her abusive, turbulent, and violent relationship with Defendant KEARNEY, he continued to pursue her, as he consistently contacted her via email between April-September 2016.

52. In or around August 2016, Plaintiff moved back to New Jersey. At the time, Defendant KEARNEY lived in Harlem, New York.

53. After Defendant KEARNEY attempted to contact Plaintiff for several months, on or about October 4, 2016, Plaintiff called Defendant KEARNEY and told him that she had retained an attorney to pursue claims for domestic violence.

54. Defendant KEARNEY immediately sent Plaintiff an email:

   "Good Afternoon [Plaintiff], Hope all is well. Thank you for calling me today, 10/4/2016, approximately 3 pm EST, in regards to your concerns about your past medical bills and injuries; possible litigation for potential assault, battery and I.E.D claims; and a future settlement proposal(s).  As discussed, I am willing to discuss settling this matter in order to save heartache and pain, time, and attorney fees.  Please send me a copy of all bills.  Additionally, please present some form of verification for all other out of pocket expenses and losses…"

55. Ultimately, Plaintiff did not pursue legal claims against Defendant KEARNEY at the time, and he did not reimburse Plaintiff for her medical expenses.

56. Instead, Defendant KEARNEY manipulatively smoothed things over for the time being as he told Plaintiff how much he loved her, and swore that he would work on their relationship and never hurt her again.

57. Around the same time, in a recorded telephone conversation between Plaintiff and Defendant KEARNEY, Plaintiff asked, "If my sister were to ask you why you were verbally abusive, what are you going to say?"  Defendant KEARNEY replied, "**There's no excuse.  I was wrong.  I have a mental problem.  I have an issue**."

58. Then, Plaintiff asked Defendant KEARNEY, "What if she said – why were you physically abusive?  What [are] you going to say then?"  Defendant KEARNEY again replied, "**I mean there's no excuse**."  Plaintiff asked, "**How would you know you're not going to hit her again**?"  Defendant KEARNEY replied, "Because we're going to work on…techniques for being able to talk out our problems."

59. Nevertheless, Defendant KEARNEY's cycle of abuse continued.

9

60. On or about December 15, 2016, amidst another argument, Defendant KEARNEY text messaged Plaintiff, "[Plaintiff] you are wack…it's easy to look at everyone else's life and point fingers but you literally are FAT, you aren't losing weight, nor are you moving forward in your career so I'm confused on what [you would] bring to the table that I would want…"

61. In or around January 2017, after several more arguments, Plaintiff and Defendant KEARNEY instituted civil restraining orders against each other.

62. A few months later, Defendant KEARNEY reached out to Plaintiff to smooth things over, and they continued to date.

63. In or around October 2017, Defendant KEARNEY beat up Plaintiff while they were attending an NFL football game in Dallas, Texas. Defendant KEARNEY dragged Plaintiff on the asphalt, which was covered in glass, in the parking lot of the stadium. Afterwards, Defendant KEARNEY purchased makeup for Plaintiff to cover the bruises on her face.

64. On or about February 18, 2018, Plaintiff and Defendant KEARNEY got into another fight. When Plaintiff told him that she did not like being called fat, he pushed her, and punched her upper chest, leaving a bruise. Later that afternoon, Defendant KEARNEY yelled at Plaintiff while they were walking outside. The police pulled over and stopped them to ask what happened to Plaintiff's chest, referring to the bruise.

65. Plaintiff told the police officers that Defendant KEARNEY had punched her. As a result, Defendant KEARNEY was arrested.

66. A few days later, Defendant KEARNEY apologized to Plaintiff, and they made up. Despite the continued assaults and violence, Plaintiff continued to date Defendant KEARNEY on and off.

67. On or about July 1, 2019, Defendant KEARNEY and Plaintiff travelled to New Orleans,

Louisiana and stayed at the Crowne Plaza Hotel. While they were there, **Defendant KEARNEY strangled Plaintiff while she was laying on the bed in their hotel room**.

68. Again, Plaintiff and Defendant KEARNEY made up and continued their on-again off-again relationship.

69. On or about January 11, 2020, Plaintiff emailed Defendant KEARNEY that she was going to file a civil restraining order. As a result, in order to blackmail Plaintiff, Defendant KEARNEY called the local police, in the town that Plaintiff's parents lived in Pennsylvania, and falsely reported that Plaintiff threatened to kill him with her father's gun.

70. On or about January 12, 2020, Plaintiff was arrested by the local police in New York who were investigating Defendant KEARNEY's allegations.

71. Therefore, Plaintiff ended all communications with Defendant KEARNEY.

72. In the spring of 2020, Plaintiff and Defendant KEARNEY instituted cross restraining orders, which were in effect until January 1, 2024.

73. The above are just some of the examples of abuse and assault that Plaintiff had to endure during her relationship with Defendant KEARNEY.

74. Defendant KEARNEY's actions and conduct were intentional and intended to harm Plaintiff.

75. Defendant KEARNEY would not have assaulted or battered Plaintiff but for her sex/gender.

76. As a result of Defendant KEARNEY's actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

77. As a result of Defendant KEARNEY's predatory and intolerable treatment of Plaintiff, she suffered severe emotional distress and physical ailments.

78. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer future pecuniary losses, emotional pain, suffering, inconvenience, loss of

enjoyment of life, and other non- pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

79. As Defendant KEARNEY's conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages.

**AS A FIRST CAUSE OF ACTION
UNDER NEW YORK CITY ADMINSITRATIVE CODE
<u>GENDER-MOTIVATED VIOLENCE PROTECTION ACT</u>**

80. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

81. The Administrative Code of City of NY § 8-903 provides that:

    a. "Crime of violence" means an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law or that would constitute a misdemeanor or felony against property as defined in state or federal law if the conduct presents a serious risk of physical injury to another, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction.

    b. "Crime of violence motivated by gender" means a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender.

82. The Administrative Code of the City of NY § 8-904 provides that, "Any person claiming to be injured by an individual who commits a crime of violence motivated by gender as defined in § 8-903 of this chapter, shall have a cause of action against such individual in any court of competent jurisdiction."

83. Defendant KEARNEY engaged in conduct that violated the Gender Motivated Violence Protection Act as set forth herein.

84. Defendant KEARNEY is civilly liable under § 213-c for criminally assaulting, battering, strangulating, and harassing the Plaintiff pursuant to the New York State Penal Law as described above.

**WHEREFORE,** Plaintiff respectfully requests a judgment against the Defendant:

A. Declaring that Defendant engaged in unlawful gender motivated violence prohibited by the New York City Administrative Code;

B. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to reputation in an amount in excess of the jurisdiction of all lower courts;

C. Awarding Plaintiff Punitive Damages;

D. Awarding Plaintiff attorney's fees, costs, and expenses incurred in the prosecution of the action;

E. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy Defendant's unlawful employment practices.

## JURY DEMAND

Plaintiff demands a trial by jury.

**WHEREFORE**, Plaintiff demands judgment against the Defendant, in an amount to be determined at the time of trial plus interest, Punitive Damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

Dated: New York, New York
February 20, 2025

**PHILLIPS & ASSOCIATES, PLLC**

By: /s/ *Jesse S. Weinstein, Esq.*
Jesse S. Weinstein, Esq.
45 Broadway, 28th Floor
New York, New York 10006
(212) 248-7431
jweinstein@tpglaws.com

13